# EXHIBIT A

Fulton County Superior Court
***EFILED***TV
Date: 7/18/2019 3:46 PM
Cathelene Robinson, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

| | |
|---|---|
| Debra Austin and Tammy Baker, on behalf of themselves and all others similarly situated, | ) Case No.: 2019CV324006 |
| **Plaintiffs,** | ) |
| vs. | ) |
| Grand Canyon University, Inc. and Grand Canyon Education, Inc. | ) |
| **Defendants** | ) |

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb and serve upon plaintiff's attorney, whose name and address is:

E. Adam Webb
Webb, Klase & Lemond, LLC
1900 The Exchange SE, Suite 480
Atlanta, Georgia 30339

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This _7/18/2019_ day of _____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

_____
Deputy Sheriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***TV
Date: 7/18/2019 3:46 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

|  |  |
|---|---|
| DEBRA AUSTIN and TAMMY BAKER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GRAND CANYON UNIVERSITY, INC. and GRAND CANYON EDUCATION, INC.,<br><br>Defendants. | Civil Action No. 2019CV324006 |

## CLASS ACTION COMPLAINT

Plaintiffs Debra Austin and Tammy Baker hereby allege the following based on personal knowledge as to allegations regarding Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION AND PARTIES

1.

This action seeks monetary damages, declaratory relief, and restitution from Defendants based on their improper practice of enrolling students in professional degree programs that are not accredited such that students ultimately receive no benefit after spending substantial time taking classes and paying – or becoming indebted for – thousands of dollars in tuition. Grand Canyon aggressively markets its academic programs to potential students using "advisors" who are actually financially-motivated salespeople who push prospective students to take courses

Fulton County Superior Court
***EFILED***TV
Date: 7/18/2019 3:46 PM
Cathelene Robinson, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

|  |  |
|---|---|
| Debra Austin and Tammy Baker, on behalf of themselves and all others similarly situated, | ) Case No.: 2019CV324006 ) ) ) |
| **Plaintiffs,** | ) ) ) |
| vs. | ) ) ) |
| Grand Canyon University, Inc. and Grand Canyon Education, Inc. | ) ) ) ) |
| **Defendants** | ) ) ) ) ) |

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb and serve upon plaintiff's attorney, whose name and address is:

> E. Adam Webb
> Webb, Klase & Lemond, LLC
> 1900 The Exchange SE, Suite 480
> Atlanta, Georgia 30339

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This ___7/18/2019___ day of _____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
                    Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

_____
Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***TV
Date: 7/18/2019 3:46 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

|  |  |
|---|---|
| DEBRA AUSTIN and TAMMY BAKER, on behalf of themselves and all others similarly situated, )))) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 2019CV324006 |
| GRAND CANYON UNIVERSITY, INC. and GRAND CANYON EDUCATION, INC., ))) | |
| Defendants. ))) | |

## CLASS ACTION COMPLAINT

Plaintiffs Debra Austin and Tammy Baker hereby allege the following based on personal knowledge as to allegations regarding Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION AND PARTIES

1.

This action seeks monetary damages, declaratory relief, and restitution from Defendants based on their improper practice of enrolling students in professional degree programs that are not accredited such that students ultimately receive no benefit after spending substantial time taking classes and paying – or becoming indebted for – thousands of dollars in tuition. Grand Canyon aggressively markets its academic programs to potential students using "advisors" who are actually financially-motivated salespeople who push prospective students to take courses

even when the courses will not meet the students' needs. No student should ever be enrolled in a course of study which Grand Canyon University knows will not be accepted due to the program's lack of accreditation. Moreover, the federal government – which funds nearly all tuition for Grand Canyon University students – should not be wasting hundreds of millions of dollars each year on unaccredited degree programs which do not advance students.

2.

Plaintiff Debra Austin is a citizen of the State of Georgia who signed up for Grand Canyon University's educational leadership doctorate program. Mrs. Austin is a school teacher in Georgia. Her goal – as she plainly communicated to her Grand Canyon recruiter – was to earn her PhD so that she could obtain a higher teaching credential in the State of Georgia. This would have resulted in an immediate pay raise of approximately $7,000 per year and would have allowed her to gain promotions, such as principal, vice-principal, or even superintendent. At all relevant times, the State of Georgia's standards board which controls educational licensure has _**not**_ accepted Grand Canyon University coursework or degrees. In fact, _**only four states in the entire country will accept this Grand Canyon degree**_. After spending thousands of hours taking online classes, and racking up approximately $65,000 in federal student loans, Mrs. Austin was told by another Grand Canyon student that some states would not accept the Grand Canyon degree. Mrs. Austin then contacted the Georgia Professional Standards Commission and was informed that she had wasted her time and money at Grand Canyon; a Grand Canyon degree would not be accepted in Georgia. Further, none of her course credits could be transferred to programs that were accredited by the state. Mrs. Austin confirmed with several other accredited schools that they would not accept any of her extensive course credits from Grand Canyon. Mrs.

2

Austin – and the federal government – had paid Grand Canyon $65,000 for nothing. Perhaps even more tragic, Mrs. Austin had taken thousands of hours away from her children, her family, and her work as an elementary school teacher to pursue the Grand Canyon degree. All this time and treasure was wasted.

3.

No student would ever knowingly enroll in a non-accredited professional degree program that does not serve their goals. The only way this occurs is through the active, intentional, and institutional program of fraud and disinformation engineered by Defendants. This case aims to obtain some measure of recompense for Grand Canyon's despicable acts.

4.

Plaintiff Tammy Baker was a healthcare worker in Ohio who enrolled in Grand Canyon University's Masters in Mental Health Counseling degree program in order to become a licensed professional counselor. She was specifically informed by her Grand Canyon recruiter that this program was accredited such that she would be able to become certified in Ohio. This was not true. At no time was Grand Canyon accredited as required by the State of Ohio. After taking several courses and spending over $14,000 on tuition (all of which was funded by the United States government), Mrs. Baker was informed by a co-worker who had graduated from the same program that Grand Canyon was not properly accredited in Ohio. After further delays and lies from Grand Canyon, Mrs. Baker confirmed that her Grand Canyon degree program was not accredited in Ohio (or most other states for that matter). She then attempted to transfer her course credits to an accredited program so she could obtain a degree from an accredited program. No accredited school would accept any of her Grand Canyon course credits. Like Mrs. Austin,

3

all of her time and tuition had been wasted.

5.

No student would ever knowingly expend hundreds or even thousands of hours taking classes and become indebted for tens of thousands of dollars in order to obtain a degree that is not accepted because the Grand Canyon program is not accredited. Furthermore, because accredited schools will not accept the Grand Canyon course credits, the effort and expense has been completely wasted. Yet Grand Canyon enrolls thousands of students each year in unaccredited programs, primarily in the educational and healthcare fields. Students are induced to spend time away from their families and jobs – often hundreds or even thousands of hours – and take out federal student loans that they will be saddled with for decades, for zero return. The human misery caused by Grand Canyon's scheme is incalculable.

6.

Defendant Grand Canyon University, Inc. is an Arizona corporation registered to do business in Georgia and can be served with process via its agent InCorp Services, Inc., 2000 Riveredge Parkway NW, Suite 885, Atlanta, GA 30328. This address is in Fulton County.

7.

Grand Canyon University was a small non-profit Christian college in Arizona until 2004 when it was sold to a for-profit company. Investors and officers of Apollo Management and another online school, University of Phoenix – all of whom had profited handsomely from for-profit educational ventures – were brought in to run Grand Canyon. The school grew rapidly, primarily by aggressively marketing its online programs. Online programs are exponentially more profitable than running a brick and mortar school because expenses for teacher salaries and

overhead are a small fraction of tuition. Grand Canyon University was able to set itself apart from other online colleges based on its Christian affiliation and the fact that it had a real campus in Arizona, including sports teams. Unfortunately, as shown below, neither the school's purported Christian affiliation nor its Arizona campus provide any benefit to online students.

8.

Grand Canyon University has created massive wealth for its leaders. For example, Grand Canyon President Brian Mueller consistently makes over two million dollars a year in total compensation. Further, he regularly cashes in stock options or stock awards worth millions of dollars. In 2019, for example, he has already sold nearly $5,000,000 worth of stock. Several other Grand Canyon executives have similarly excessive pay and perquisites.

9.

Defendant Grand Canyon Education, Inc. is the publicly-traded holding company that operates Grand Canyon University. It trades on the NASDAQ exchange under the symbol "LOPE," which is based on the school's mascot, the antelope. The stock has surged in recent years and currently trades at over $120 per share, giving it a ***market value of nearly $6.0 billion***. The company reported profits for 2018 in the amount of ***$229,000,000***. Grand Canyon Education is registered to do business in Georgia and can be served with process via its agent Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, GA 30092. This address is in Gwinnett County.

10.

Grand Canyon Education, Inc. was started in 2003 before the buyout of Grand Canyon University. It claims that it is not affiliated with Grand Canyon University, even though the two

5

corporations share the same leadership and the vast majority of Grand Canyon Education's business is tied to Grand Canyon University. As described below, Grand Canyon Education has recently completed a series of complex corporate transactions which (at least arguably) leave Grand Canyon Education as a for-profit educational services company and Grand Canyon University as a "non-profit" school.

11.

For purposes of this case, Plaintiffs accept Defendants' oft-repeated assertion – which they have verified to federal regulators under oath – that they are not affiliates. Grand Canyon Education employs the marketing and recruiting army which performs the "dirty work" of misleading potential students into signing up for professional programs that are not accredited in the relevant states. It cannot be disputed that Grand Canyon University is fully aware of, and indeed an active participant, in the scheme outlined herein.

12.

Collectively, Defendants will sometimes be referred to hereinafter as "GCU" for ease of reference.

**JURISDICTION AND VENUE**

13.

This Court has jurisdiction over this case because Defendants are registered to do business in the State of Georgia and are in fact doing business in the State of Georgia. Defendants have successfully recruited thousands of Georgians to enroll at GCU, including thousands that are currently enrolled. According to public filings by GCU, over 3000 Georgians are currently enrolled at GCU. This makes GCU larger than several well-known Georgia

6

colleges and universities, including Berry, Morehouse, Spelman, and Oglethorpe. GCU takes in over $30,000,000 each year from Georgia students. Defendants have also hosted graduate degree residency programs at hotels and meeting facilities in the Atlanta area for thousands of GCU students. Thus, Defendants have sufficient minimum contacts with the State of Georgia and intentionally avail themselves of the consumers and markets within the State of Georgia through the promotion, marketing, and sale of educational programs in Georgia. This purposeful availment renders the exercise of jurisdiction by Georgia courts over Defendants permissible under judicially accepted notions of fair play and substantial justice.

14.

Venue is proper pursuant to O.C.G.A. § 14-2-510(b)(1) because Grand Canyon University has its registered agent in Fulton County.

## GENERAL FACTUAL ALLEGATIONS

15.

GCU is a rapidly growing for-profit college. GCU recently engaged in some corporate trickery in order to claim it is a "non-profit." The transactions are vaguely described in GCU's Annual Report for 2018 as follows:

> On July 1, 2018, the Company sold the University to Grand Canyon University, an independent Arizona non-profit corporation formerly known as Gazelle University, as further described below (the "Transaction"). As a result of this Transaction, GCE became an educational services company focused on providing a full array of support services to institutions in the post-secondary education sector.

The Annual Report then continues for thousands of words to describe the ornate details of how a multi-billion dollar business can justify calling itself a non-profit. Suffice it to say that GCU continues to be a for-profit business in all substantive respects.

7

16.

That GCU is by no means a true non-profit is proven on page 45 of the same 2018 Annual Report which listed $229 million in profits:

|  | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|
| Net income [in millions] | $229,011 | $203,319 | $148,514 | $131,411 |
| Earnings per common share |  |  |  |  |
| Basic | $4.81 | $4.31 | $3.22 | $2.86 |
| Diluted | $4.73 | $4.22 | $3.15 | $2.78 |

Plainly, GCU is a cash machine for its owners and executives and the profits are rapidly climbing every year.

17.

In order to keep profits climbing, however, GCU needs to sign up more and more students. In 2018, enrollment climbed from 90,297 to 97,369. This followed an even larger increase in student enrollment as described in 2017 Annual Report:

> Our enrollment at December 31, 2017 was approximately 90,300, representing an increase of approximately 10.2% over our enrollment at December 31, 2016. Our net revenue and operating income for the year ended December 31, 2017 were $974.1 million and $282.8 million, respectively, representing increases of 11.5% and 19.2%, respectively, over the year ended December 31, 2016. Our net revenue and operating income for the year ended December 31, 2016 were $873.3 million and $237.2 million, respectively, representing increases of 12.2% and 12.8%, respectively, over the year ended December 31, 2015.

This means GCU is growing each year by the size of a mid-sized university. The need to grow profits – and therefore the student population – has led to the recruitment practices at issue in this case.

8

18.

The vast majority of GCU students are online students who never set foot on the school's

Arizona campus. According to Defendants' 2017 financial reporting, for instance:

> At December 31, 2017, we had 90,297 students enrolled in our courses, of which 71,455, or 79.1%, were enrolled in our online programs, and 18,842, or 20.9%, were enrolled in our ground programs. Of our students in online programs, which were geographically distributed throughout all 50 states of the United States, and Canada, and in professional studies programs, 86.1% were age 25 or older. Of our traditional on-campus students, 95.6% were under age 25 and, although we draw students from throughout the United States, a majority were from Arizona.

With 7,000 more students added in 2018, and only 20,000 students at the Arizona campus, GCU

now has nearly approximately 77,000 online students. Each online student who enrolls at GCU

results in an average of over $3,000 in annual profit for Defendants.

19.

The most important part of Defendants' operation is the highly automated system of

obtaining federal student loans and grants. Defendants concede that over 71% of GCU's funding

comes from the federal government:

> During fiscal 2017 and 2016, we derived approximately 71.5% and 72.3%, respectively, of our net revenues (calculated on a cash basis in accordance with Department of Education standards currently in effect) from tuition financed under the Title IV programs. The primary Title IV programs that our students receive funding from are the Federal Direct Loan program or FDL Program, and the Federal Pell Grant, or Pell, Program.

Many students are not even aware that the school is procuring loans on their behalf. Before they

know it, they are tens of thousands of dollars in debt without ever being informed of the total

amount of debt that they are accruing. GCU employees are taught to gloss over the details of

loans that they procure for students. For example, they rarely provide the total amount of debt

accrued or offer any information on the anticipated amount or duration of loan payments. Since

loan repayments do not begin until students either graduate or quit the program, most students are not aware of the enormity of the debt burden they are assuming as a GCU student.

20.

Over half of GCU's 77,000 online students are working adults seeking master's of doctoral degrees in order to advance in their profession. Most such students must graduate from an accredited program to gain the benefit they are seeking from schooling. Most notably, degrees in education and healthcare are not accepted by employers or governmental entities (such as school systems or state professional standards boards) unless accredited.

21.

In order to maintain its high level of profitability, GCU simply cannot devote the level of resources which are required to obtain accreditation in many fields. For example, GCU's online professors are generally not paid enough to make GCU their full-time job. GCU leaders have confirmed that faculty compensation is approximately 15% of tuition, not 70% like most colleges and universities. GCU faculty members generally work another job (or multiple other jobs) and teach at GCU "on the side." Most of them do not acknowledge their work as a GCU "professor" on their résumés or LinkedIn pages. As a result of the low pay and need for other full-time employment, GCU faculty are not able to complete the tasks expected of faculty by many accrediting agencies, such as: preparation of proper course outlines and materials; delivering tailored lectures and answering student questions; and assisting students with the material at regularly-scheduled times. As must be expected based on GCU's low expenditure on faculty, the school is not able to hire and retain excellent professors.

22.

GCU also does not provide students and faculty with the level of resources deemed essential by many accrediting agencies. In addition to poor faculty pay, and negligible benefits, training and support does not meet minimum standards. Class materials are also substandard, often amounting to links to Internet-based websites and information. "Hands on" work is impossible or, at the very least, much less of an emphasis than in most accredited programs.

23.

Testing and other performance evaluations are not reputable at GCU. Many students complain that grading in courses is random with the main emphasis on keeping students at GCU, even when they do not show knowledge of the coursework.

24.

GCU students also often do not have the requisite level of educational background to meet standards established by most accrediting agencies. GCU also accepts nearly every student. Many students enroll in graduate programs without basic language skills. GCU, however, does not offer remedial programs to help professional students get "up to speed." Accrediting agencies are well aware that the level of student preparation is below standard and that even those students who are capable of excelling cannot benefit from interaction with other similar students.

25.

A good illustration of GCU's lack of concern for any standards in accepting students into its online programs is its recruitment of criminals in jail and recently released from jail. As long as such persons can obtain federal student loans, GCU will recruit and enroll them. Other

11

students – whose contact information is often shared with these felons – are not informed that their fellow students are felons.

26.

GCU is also notorious for accepting Spanish-speaking students for coursework that is taught in English and for which no translation services are provided. Once again, the only deciding factor for GCU's recruiters is whether the student can obtain federal student loans.

27.

For these and numerous other reasons, accrediting agencies justifiably have not accredited many GCU professional degree and certificate programs and do not accept GCU degrees or coursework.

28.

Without accreditation, GCU online degree programs are worthless to students in most fields. The largest group of GCU online students are in the education field. Teachers and other education professionals seek graduate degrees in order to increase their pay and improve their chances for promotions. In every state, however, degree programs must be accredited. Otherwise, "diploma mills" will simply issue degrees and teachers will obtain unearned benefits. Most GCU educational master's and doctorate programs are not accredited in most states. Admittedly, GCU programs are generally accredited in Arizona and are sometimes accredited in other states. No teacher seeking a graduate degree in education, however, would ever knowingly invest time or money (or indebtedness) into an unaccredited GCU program of study. None of the benefits they are seeking from the degree are available to them, whereas they could just as well take classes from dozens of accredited programs.

29.

The same is true in GCU's second largest field of online graduate study, healthcare. For obvious reasons, all states require healthcare professionals to have graduated from reputable and accredited programs before beginning certain professions in healthcare, including therapists, counselors, nurses, technicians, and even physicians and dental assistants. Most GCU healthcare degree programs are not accredited in most states. As such, no student would ever knowingly invest time or money (or indebtedness) into such an unaccredited GCU program of study.

30.

GCU is well aware that it is enrolling students under false pretenses. Its recruiters – known as "advisors" – are trained not to bring up the subject with prospective students. They are taught how to not directly answer questions about accreditation if they are asked. Some of their precise methods are described below. The recruiters knowingly sign up students for programs and courses for which the student could not possibly gain any benefit.

31.

Such conduct is obviously unethical and improper but it is also illegal. The federal government prohibits GCU (and any other school receiving federal funds) from engaging in "substantial misrepresentations." As conceded in GCU's Annual Report, the Department of Education "has defined a misrepresentation as any statement made by the institution or a third party that provides educational programs, marketing, advertising, recruiting, or admissions services to the institution that is false, erroneous or has the likelihood or tendency to deceive." Such statements can pertain to "its educational program, its financial charges, or the employability of its graduates." Defendants concede "we are subject to this regulation."

13

32.

As to every online student who is enrolled in a GCU program not accredited in their home state, GCU has made a "substantial misrepresentation."

33.

But GCU's illegal conduct does not stop there. In its push to sign up ever more students, it also violates federal law about recruiting students. Because federal funds are being used, the federal government insists that schools never use aggressive techniques to push students to sign up for programs. If a student does not truly desire to enter a program – on their own and without cajoling from GCU – a recruiter should not enroll the student. The mindset at GCU is the opposite; its "advisors" are trained to push and prod students to enroll in programs that they never even contemplated before hearing from GCU. If GCU recruiters do not do so, they are either fired or do not receive bonuses and promotions. This too is a violation of federal law and regulation.

34.

As Defendants concede on page 20 of their most recent Annual Report:

each higher education institution agrees that it will not "provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of Title IV, HEA program funds." Pursuant to this rule, we are prohibited from offering our covered employees, which are those involved with or responsible for recruiting or admissions activities, any bonus or incentive-based compensation based on the successful recruitment, admission or enrollment of students into a postsecondary institution. We are also precluded from offering our covered employees that work on financial aid matters (if any), any bonus or incentive-based compensation based on the award of financial aid to students enrolled in a postsecondary institution.

14

35.

GCU has been caught violating this rule in the past and has paid millions of dollars to settle the complaint.    Since that settlement, GCU has attempted to use more corporate shenanigans to escape this rule.    The Department of Education has allowed some payments to "unaffiliated third parties" for recruitment activities.    GCU admits in its Annual Report that it takes the position that Grand Canyon Education, Inc. is NOT an affiliate of Grand Canyon University.    As such, it acknowledges that recruiters employed by Grand Canyon Education are paid incentive compensation to sign up more students.    Thus, GCU recruiters have the financial incentive and the training to enroll students in unaccredited professional degree programs.

36.

No student would ever knowingly enroll in an unaccredited professional degree program. In nearly every situation, there are literally dozens of certified programs to choose from. Likewise, no college or university of integrity would ever knowingly enroll a student in an unaccredited program.    For example, if a potential student from Georgia seeks to become of physician's assistant, and the school's physician assistant program is not accredited in Georgia, then the student should never be enrolled in the unaccredited program.

## PLAINTIFFS' FACTUAL ALLEGATIONS

37.

Both Plaintiffs stand in the shoes of thousands of other victims of GCU's improper practices.    They would never have enrolled at GCU if they had known the programs they were entering were not accredited.    GCU knew Plaintiffs were being enrolled in programs that were worthless to them, but it proceeded to sign them up purely based on greed.

**Plaintiff Debra Austin**

38.

Mrs. Austin raises her two children with her husband in Statesboro, Georgia. She works as a teacher at Swainsboro Elementary School. She is employed by the Emanuel County School System. Mrs. Austin has been a teacher in since approximately 2006. She has been teaching in Georgia since 2012.

39.

Mrs. Austin graduated from University of Arkansas at Pine Bluff in 2009 with a bachelor's degree in business administration. She has also completed additional training for her profession, including a master's in early childhood elementary education from the University of West Alabama.

40.

Like nearly all teachers in Georgia, Mrs. Austin could receive additional pay if she obtained a doctorate degree in one of several education-related fields. Mrs. Austin could receive additional pay of approximately $7,000 per year if she completed an accredited doctorate degree. Also, she would be eligible for administrative positions, including her dream of becoming a superintendent.

41.

In 2013, Mrs. Austin began to research doctorate programs. Somehow, based on Mrs. Austin's online searches, Grand Canyon was informed of her interest in graduate programs and a GCU recruiter began to call Mrs. Austin out of the blue. This is not unusual; rather, many prospective students have reported that they began to be called and emailed by a GCU recruiter

even though they had made no attempt to contact GCU. As GCU's public filings make clear, Defendants have a massive budget for outreach, marketing, recruiting, Internet advertising, and the like. This budget includes millions of dollars spent annually with Google and other Internet search companies.

42.

Mrs. Austin had extensive discussions with her recruiter/"advisor" named Allison Rogers. Mrs. Austin explained her goal of obtaining a higher certification in Georgia to receive higher pay and improve her chances of promotion. Ms. Rogers explained that GCU's educational leadership doctoral program would be perfect for Mrs. Austin even though Ms. Rogers knew the GCU program was not accredited in Georgia. Mrs. Austin continued to press Ms. Rogers by asking specifically if the doctoral program in educational leadership would be accepted by Georgia if she sought to be a superintendent, or other position in school leadership. Ms. Rogers affirmed that the GCU program would meet all Georgia criteria. Ms. Rogers had been trained by GCU to mislead prospective students about whether GCU programs were accredited in the states where they work.

43.

Ms. Rogers proceeded to call and email Mrs. Austin constantly. Ms. Rogers stated that Mrs. Austin had to enroll right away or she would miss out on the opportunity to enter the program and her degree would be delayed. This was a lie but one taught by GCU to its recruiters. GCU has rolling admissions and there was no difference in the program based on Mrs. Austin's start date. In order to prevent candidates from researching GCU, and perhaps finding the many cautionary online warnings, these hurry-up tactics have been developed.

17

Numerous Better Business Bureau and online complaints describe the same techniques being utilized by other GCU recruiters.

44.

Ms. Rogers was trained by GCU to tell many lies. For example, she promised that the degree would be completed within three years, that federal financial aid would cover all costs, that course credits were transferrable to other colleges, and that Mrs. Austin would be able to use the degree for higher pay and promotions in the State of Georgia. None of these promises were true.

45.

Based on Ms. Rogers' constant calls and emails, and her threats that any delay would greatly harm Mrs. Austin's ability to complete the program, Mrs. Austin agreed to enroll.

46.

Ms. Rogers used highly automated procedures to enroll Mrs. Austin and obtain federal student loans in her name. Mrs. Austin began online classes almost immediately.

47.

After years of sacrifice and succeeding in her classes, Mrs. Austin completed 60 credit hours and started on her dissertation. It became obvious at that point that GCU did not want her to complete her degree. GCU knew that – if Mrs. Austin finished her degree – she would then discover that her degree served no purpose and was not accepted by Georgia's professional standards board for any purpose. Based on its prior experience with other students who obtained unaccredited degrees, GCU was aware that risks to the school – such as regulatory complaints,

Better Business Bureau filings, even threats of lawsuits – are exacerbated when students become aware that their degree is worthless.

48.

Also important to GCU was keeping tuition income flowing from Mrs. Austin. Once she had her degree, Defendants were well aware that Mrs. Austin would no longer be a "cash cow" for GCU. Thus, GCU worked shamelessly to set up road blocks in Mrs. Austin's path.

49.

GCU used various tactics to extend the program – and ultimately to force Mrs. Austin to drop out of the program – rather than allowing her to successfully complete the program. Such tactics included switching her advisors regularly, providing a nonresponsive dissertation chairperson, offering contradictory advice on her dissertation proposals and drafts, delaying responses, and using unprofessional and abusive behavior. Some or all of these same tactics have been reported by nearly all GCU students who have made it to the dissertation phase of their online doctorate program. GCU intentionally sets up barriers to prevent completion of degrees, particularly in unaccredited programs, because it knows that once students like Mrs. Austin have the degree, they will quickly learn from an employer or state certification board that they have been defrauded. In Mrs. Austin's case, GCU knew that she would promptly be informed that she would not be entitled to any additional pay or promotions as a Georgia teacher because the GCU doctorate program was not accredited in Georgia.

50.

At her GCU residency in Atlanta (which was a complete waste of time and money), one of GCU's most senior officers, Dr. Wayne Schmidt, the chair of GCU's educational doctorate

program, slipped up and told Mrs. Austin and the assembled students that *only three percent of those who enroll in GCU doctoral programs ever obtain their degree.* The primary reason for such a poor completion rate is obvious: GCU knows that if students do not obtain the degree, they will not become infuriated when they learn that the entire effort was wasted and that GCU knew full well that the student could not benefit from the unaccredited program from the beginning. Of course, when students obtain a degree, the tuition funds also stop flowing to GCU. Since GCU course credits are generally not transferrable to accredited programs, Mr. Schmidt's admission that only 3% of students obtain a doctorate means that nearly all federal loans to GCU doctorate students are wasted. Mrs. Austin and those around her were shocked to hear this statistic. They all agreed that if they had known almost nobody ever finished the doctorate, they would not have enrolled.

51.

Mrs. Austin befriended a few other GCU students at her Atlanta residency program. One of these students called Mrs. Austin to inform her that she had learned that the GCU educational doctorate would not be accepted by another state because the program was not accredited in that state.

52.

Mrs. Austin was alarmed. She immediately began to investigate whether GCU's educational doctorate program was accredited in Georgia. She learned that it was not. The Georgia Professional Standards Commission ("GPSC") informed her that, because GCU was not properly accredited, her degree program and course credits would not be accepted by any school system in Georgia. Mrs. Austin was is dismay. How could GCU – a large national institution –

20

use such dastardly tactics?  How could GCU officials and employees live with themselves knowing they were wrecking students' lives?  How could they think they could get away with it?

53.

Mrs. Austin struggled to find some use for her thousands of hours of work and enormous student loan debt.  She was informed that she could submit a request to the GPSC to review her coursework.  Even though she did not complete the degree, in some instances Georgia will consider extensive coursework to provide an upgraded credential.  Mrs. Austin completed the request and submitted her transcript to the GPSC.

54.

In October of 2017, the GPSC responded with a letter which stated: "Grand Canyon University does not meet the current institutional requirements being that the University does not hold one of the above mentioned accreditations."  Mrs. Austin was not able to obtain any benefit whatsoever from over 60 hours of coursework with a 3.5 grade point average from GCU.

55.

She also contacted several other schools to see if she could transfer some or all of her course credits from GCU to an accredited program.  On each occasion, she was told that GCU credits would not be accepted.

56.

Mrs. Austin was understandably depressed.  She was so disconsolate that she even considered completing a lesser degree program from GCU, just to have something to show for all of her wasted effort and indebtedness.  If she continued to take classes she would also be excused

21

from beginning payments on her enormous student loan debt. Her latest of several GCU advisors worked aggressively to push Mrs. Austin to continue taking worthless classes at GCU.

57.

Fortunately, Mrs. Austin was finally able to "stop the bleeding" and extricate herself from GCU in 2017.

58.

She contacted the federal government in order to object to her student loan debt based on GCU's many misdeeds. Mrs. Austin filed her "Borrower Defense" claim with the federal government requesting to have the loans forgiven. The request is still pending.

59.

Mrs. Austin would never have enrolled with GCU if Defendants had not informed her that the doctorate program was accredited and would meet all of her needs as a Georgia educator. GCU should never have pushed her to enroll – or even allowed her to enroll – in a program that failed to meet any of her needs. GCU's conduct was unethical, immoral, and illegal.

**Plaintiff Tammy Baker**

60.

Mrs. Baker is a citizen of West Virginia who lives in Point Pleasant, which is on the Ohio border. She is married and has three adult children.

61.

After she graduated from Marshall University in 2014, Mrs. Baker began a job at a healthcare facility in Ohio. She worked as a case manager for a major healthcare corporation.

22

62.

Due to experience with a family member and her desire to help others in need, Mrs. Baker sought to become licensed to perform even higher level work with those suffering from substance abuse and seeking rehabilitation. Thus, she went back to Marshall University to become a licensed social worker. She graduated in 2016, passed the required testing, and became an Ohio-licensed LSW, or licensed social worker. She continued to work at the same healthcare facility, just in a position with more responsibility and direct contact with patients.

63.

Mrs. Baker had truly found her calling and her passion. She wanted to further increase her ability to assist those suffering from substance abuse. Because she worked at a healthcare facility with many healthcare professionals, she was aware that becoming a licensed professional counselor ("LPC") would enable her to take on more responsibility and help even more people.

64.

In order to qualify as an LPC in Ohio – and West Virginia for that matter – a master's level degree in counseling or a closely related field is required. After completing a master's level degree, LPC applicants must pass a national test and complete an internship or work experience requirement. The first step was entering an accredited master's level program.

65.

In Fall of 2016, Mrs. Baker began to research possible programs that would afford her the certification necessary to proceed. She searched online and found Grand Canyon University's website, which was of course at the top of the search results based on GCU's massive marketing budget. Mrs. Baker entered her information as a potential student and GCU began to call her

"off the hook." Mrs. Baker ducked the calls for several days but eventually took a call. Her GCU recruiter/"advisor" was named Tracy Coleman.

66.

Mrs. Baker was an experienced healthcare professional already and she quickly cut to the chase with Ms. Coleman, stating "Ohio is very strict in its licensing requirements" and asking "is Grand Canyon fully accredited so I will be able to practice in Ohio?" Ms. Coleman confirmed in no uncertain terms that GCU was accredited.

67.

Mrs. Baker was crystal clear with Ms. Coleman that she desired to be an LPC in Ohio, where she already worked as a licensed social worker. Ms. Coleman assured Mrs. Baker that the GCU master's program was accredited and that the GCU professional counseling degree program would be ideal for her needs.

68.

Mrs. Baker agreed to enroll. Ms. Coleman used GCU's automated systems to quickly obtain a federal student loan in Mrs. Baker's name. The federal funds were paid directly to GCU.

69.

After taking several GCU online classes from the Fall of 2016 through the Spring of 2017, Mrs. Baker spoke with a co-worker who had also been a GCU student seeking a master's degree for counseling. The co-worker told Mrs. Baker that she had graduated from GCU and then learned that GCU was not accredited. As a result, the co-worker was not able to even qualify to take the test to become an LPC.

24

70.

Mrs. Baker immediately asked Ms. Coleman whether this was true. Ms. Coleman refused to respond.

71.

As is often the case when uncomfortable questions arise, GCU switched Mrs. Baker's advisor. Innumerable student complaints describe GCU's practice of changing student advisors regularly. This practice serves GCU's purposes in several ways. First, it allows the new advisor to disavow any knowledge of representations made by prior advisors. Second, it allows advisors to avoid answering tough questions, including those about accreditation. Third, it allows GCU to extend students' enrollment – and, therefore, earn more tuition dollars – based upon purported changes to degree requirements which were not communicated by prior advisors.

72.

Mrs. Baker ultimately was able to pin down her new advisor, although it took several weeks. At first, when Mrs. Baker asked "is my program accredited?" the advisor used a well-rehearsed and often-utilized response: "yes, Grand Canyon is fully accredited." In this way, the advisor is able to put students at ease and continue bringing in tuition income from them, without telling a total lie. It is true that Grand Canyon University as an institution is accredited, even though many of its professional degree programs are not.

73.

Luckily, Mrs. Baker asked follow up questions. When she asked point-blank "no, not is the university accredited, is my program accredited with the State of Ohio?" finally the new advisor was forced to tell her the truth. that GCU was not accredited.

25

74.

In Ohio, professional counselors must have a graduate degree from a program accredited

by the Council for Accreditation of Counseling and Related Educational Programs ("CACREP").

Pursuant to Regulation 4757-13-07, entitled "Counselor program approval":

> All Ohio programs are required to be accredited by the Ohio department of higher
> education and are required to be "Council for Accreditation of Counseling and
> Related Educational Programs" "CACREP" clinical mental health program,
> clinical rehabilitation counseling program, or addiction counseling program
> accredited by January 1, 2018; and if so accredited are deemed to be approved
> programs per division (B)(2) of section 4757.23 of the Revised Code.

75.

The same is true in West Virginia, although other accrediting bodies are also permitted.

Subsection 6.1 of "Qualification of New Applicants" for professional counselors states:

> 6.1. Education: The education requirements for the licensure of applicants are set
> forth in W. Va. Code §30-31-8. To meet those requirements, an applicant shall
> have one of the following degrees: 6.1.a. A master's or doctoral degree from an
> institution with a program accredited by the Council on Accreditation of
> Counseling and Related Educational Programs (CACREP), the Council for the
> Accreditation for Education Preparation (CAEP), the North Central Association
> of Colleges and Schools (NCACS), the Southern Association of Colleges and
> Schools (SACS), Council on Rehabilitation Education (CORE), or a comparable
> accrediting body.

76.

GCU has never been accredited by CACREP. This is not surprising since the GCU

program basically enrolls any student who qualifies for student loans. Without standards for

students or faculty, the GCU program cannot obtain CACREP accreditation. As one student

complained on www.onlinedegreereviews.org on May 29, 2016:

> Grand Canyon University does not require any sort of testing before being
> accepted into the M.S. in Professional Counseling program, and unfortunately,
> this shows in the quality of the many of my classmates. Some classmates are not

26

able to form coherent sentences. Most are barely able to write at a high school level. The quality of the instruction is lacking in most cases as well. There have been times when I, and other students, have asked for feedback and the instructor is unwilling (or perhaps unable) to provide any insight into the topic. Other instructors have been so awful, I've lost my interest in learning in those classes. I've felt like I was alone. I am basically teaching myself and learning from textbooks. I listen to my coworkers talk about their counseling program classes, and I am envious. They're actually learning how to do counseling. I feel like I'm learning how to fake my way through it. If I were an employer, I would require some serious intelligence testing before I hire anyone with a GCU degree, simply because the program does not actually teach, but still passes out counseling degrees. It is not surprising then that GCU is not CACREP accredited.

77.

Mrs. Baker had wasted all of her time and money in the GCU program. The total amounts of her federal student loans utilized at GCU – over $14,000 in total – were also wasted.

78.

She tried to transfer her GCU course credits to an accredited school but was informed that GCU course credits could not be transferred. Mrs. Baker has not benefited in any way from her GCU program. She has not been able to become an LPC. Rather than continue her effort to become an LPC she returned to Marshall University and earned her master's in social work. She was not able to utilize any of her course credits from GCU.

79.

Mrs. Baker would never have enrolled at GCU if Defendants had not informed her that the program would meet all of her needs toward becoming a professional counselor. GCU should never have pushed her to enroll – or even allowed her to enroll – in a program that failed to meet any of her needs. GCU's conduct was unethical, immoral, and illegal.

27

## CLASS ACTION ALLEGATIONS

80.

Plaintiffs bring this class action on behalf of themselves and the following class of persons:

> All Grand Canyon University students who have been enrolled in an online professional graduate degree or certificate program that is not accredited in the state where they are employed or, if not employed, where they reside.

81.

Excluded from the Class are Defendants' officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

82.

The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants cease their improper conduct.

83.

Numerosity: The members of the proposed Class are so numerous that individual joinder of all members is impracticable. In its 2018 Annual Report, GCU listed over 97,000 students enrolled. Filings in 2019 show that the total student population now exceeds 100,000. Public filings by GCU show that over 77,000 of its students are online students and over 50% of online students are graduate students pursuing master's and doctoral degrees. GCU's most popular programs are its post-graduate degrees for teachers and healthcare workers. Thus, tens of

28

thousands of current and former students are likely included in the Class. The exact number and

identities of the members of the proposed Class are unknown at this time and can be ascertained

only through appropriate discovery.

84.

The size of the class can also be gleaned from the hundreds of complaints lodged by

students and former students with the Better Business Bureau and various online forums. For

example, this complaint was lodged with the Better Business Bureau on March 14, 2019:

> They told me that they were accredited in South Carolina and they are not. I
> started class on Sunday and have been trying to get out of the school for three
> days. Initially they apologized for lying to me and said that they were going to
> get me a refund and then someone else called me and insisted that they are
> accredited but I have to file for a change. That is NOT being accredited in my
> state. I was lied to and now they are trying to collect 935$ from me for dropping
> out of the class when I had no idea that they were not accredited in my state and
> they lied to me. They told me they were. The only reason I found out was
> because I saw on their website looking for information for an assignment that they
> are only accredited in 19 states and South Carolina is not one. It took me three
> phone calls and three emails to FINALLY get out of the school and I totally feel
> cheated! How can you do this to an out of state student with a low income and
> then expect them to pay for your services when you lied to them from the very
> beginning? That is not my fault, that is their fault for being dishonest!

85.

By way of further example, this complaint appeared on www.gradreports.com and was

posted on May 3, 2018:

> So I just graduated April 2018, and I received the Masters in Education leading to
> a credential in multiple subjects and frankly, I am highly disappointed that the
> school lacks communication regarding specific requirements from outside states.
> I live in CA and I was never told that I needed a CLAD authorization which is an
> authorization to teach language learners. (their SEI requirement) which caused me
> to add additional testing after the program ended. Do not waste your time going
> here if you live in CA. CA's schools has [sic] this authorization embedded in
> their teacher programs so I would go that route. If you go here, you will end up
> taking additional courses which will cause you to add to your debt. Now, I have

29

to pay 3000 for a course in CLAD certification and add 9-12 months which I could be searching for employment. So disappointed and sad.

86.

The same scheme has clearly been in effect for years. This complaint was listed on

www.onlinedegreereviews.org on May 4, 2016:

I am at the end of the first class that Grand Canyon University said I must take and pay for. But, the degree I wanted was social work and I was told I could take the social work class, but I had to find somewhere to get the hours I needed as volunteer services which was 400 hours. I called the board for social services in my area and found out that GCU is not accredited for social work. So when I contacted my student adviser. She told me that the degree does not lead to a license. Of course I asked her what was the degree valid for if I can not get a license. This was something I truly wanted to do. To help many in the community who are less fortunate. Now, they are telling me that I will have to pay for three classes even though I have not taken nothing but one class. So, now I am stuck at their school that lied to me about having a relevant social worker program. I am so disappointed and I believe that this type of fraud to students who are receiving student loans that are guaranteed by the US government should be looked into. They should not be able to commit fraud at their leisure.

87.

This complaint was listed on www.onlinedegreereviews.org on June 16, 2014:

I live in Illinois and was assured by the recruiter that the University's program would be accepted. I contacted the state, they never responded to me. I completed the courses and earned me masters...then months later, Illinois tells me they do not recognize them. Have a masters I can't use now.

88.

Common Questions of Law and Fact Predominate: There are many questions of law and

fact common to Plaintiffs and the Class and those questions substantially predominate over any

questions that may affect individual Class members. Common questions of law and fact include,

but are not limited to:

    a.  Does GCU knowingly enroll students in professional programs which are unaccredited in the relevant state?

    b.  Do GCU's practices amount to fraud or misrepresentation?

    c.  Did GCU violate federal law or regulations?

    d.  Does Arizona law apply?

    e.  Were Defendants unjustly enriched as a result of their improper conduct?

89.

Typicality:  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been similarly affected by the actions of Defendants. Defendants' conduct as described herein is the same or substantially the same for Plaintiffs and all members of the Class. GCU has established systematic and automated policies and practices to govern recruitment and the manner in which staff enroll students in non-accredited professional programs. Thus, the experiences of Plaintiffs are typical.

90.

Adequacy of Representation:  Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

91.

Superiority of Class Action:  Plaintiffs and the members of the Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct. A class

action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

92.

Risk of Inconsistent or Varying Adjudication: Class treatment is proper and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for the Defendants as the parties opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

93.

Action Generally Applicable to Class as a Whole: Defendants, as the parties that may potentially oppose certification of the Class, have acted or refused to act on grounds generally

applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## REQUESTS FOR RELIEF

## COUNT I: Fraudulent Omission

94.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-93 above as though fully set forth herein.

95.

Plaintiffs bring this claim individually and on behalf of all other Class members.

96.

As alleged in this Complaint, Defendants knew but intentionally failed to disclose that their online professional degree and certificate programs were not accredited in many states.

97.

Plaintiffs and the other Class members were told and otherwise led to believe that the programs were accredited. GCU has trained in recruiters to masterfully deflect all questions about accreditation. For example, when prospective students ask "is this program accredited?" recruiters are taught to respond "absolutely, Grand Canyon is fully accredited," thus putting students at ease.

98.

Defendants knew that Plaintiffs and other Class members would not knowingly sign up for unaccredited professional programs. Thus, trickery and lies of omission had to be utilized.

Defendants intentionally and improperly failed to disclose the truth to induce Plaintiffs and other Class members to enroll.

99.

The issue of accreditation was material to Plaintiffs and the other Class members.

100.

Had Defendants disclosed that the programs were not accredited, Plaintiffs and the other Class members would not have enrolled.

101.

Had Plaintiffs and the other Class members been apprised of the true facts – that Defendants' programs were not accredited – they would not have enrolled or agreed to use federal student loans to pay tuition.

102.

Plaintiffs and the other Class members were damaged in an amount to be proven at trial as a result of Defendants' fraudulent omission and failure to disclose the true nature of their accreditation status.

103.

Accordingly, Plaintiffs seek monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## COUNT II: Fraudulent Misrepresentation

104.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-103 above as though fully set forth herein.

34

105.

Plaintiffs bring this claim individually and on behalf of all other Class members.

106.

Defendants expressly represented to each Plaintiff and other Class member that the GCU online professional programs were accredited.

107.

In fact, Defendants' programs were not accredited in the states where Plaintiffs and the other Class members worked or lived.

108.

Defendants also expressly represented to each Plaintiff and other Class member that their program would meet the student's expressed professional need.

109.

In fact, an unaccredited professional program leading to a degree or certificate is worthless. None of the benefits sought by a student are available for an unaccredited program; there will be no increased pay, no state license, and no better job opportunities. Further, GCU class credits are not accepted by accredited programs, and thus cannot be transferred to shorten the path to an accredited degree or certificate.

110.

Defendants expressly represented to Plaintiffs and the other Class members that they were entering accredited programs. By stating that the programs were accredited, GCU fraudulently misrepresented the programs.

111.

Defendants expressly represented to Plaintiffs and the other Class members that their academic programs would meet the professional needs of the students. By stating on those programs would meet the needs of each Plaintiff and the other Class members, GCU fraudulently misrepresented the benefits of its programs.

112.

Had GCU accurately represented that its programs were not accredited, Plaintiffs and the other Class members would not have enrolled and would not have authorized any student loans to be requested on their account.

113.

Plaintiffs and the other Class members were damaged in an amount to be proven at trial as a result of Defendants' fraudulent misrepresentations concerning the true nature of their professional programs.

114.

Accordingly, Plaintiffs seek monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## COUNT III: Violation of Racketeer Influenced and Corrupt Organizations ("RICO") Act 18 U.S.C. §§ 1962(a), (c)-(d)

115.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-114 above as though fully set forth herein.

116.

Plaintiffs bring this claim individually and on behalf of all other Class members.

117.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. are each "persons" under 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property."

118.

Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

119.

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

120.

Section 1962(d) makes it unlawful for "any person to conspire to violate" §§ 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

121.

Since at least 2013, Grand Canyon University, Inc. and Grand Canyon Education, Inc. have unlawfully increased their profits by knowingly enrolling students in professional degree and certificate programs that are not accredited.  The RICO enterprise, which both Grand Canyon University, Inc. and Grand Canyon Education, Inc. engaged in, and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of persons, including Grand Canyon University, Inc., Grand Canyon Education, Inc., and other unnamed co-conspirators.  That association in fact was structured by various contracts and non-contractual relationships between Grand Canyon University, Inc. and Grand Canyon Education, Inc. pursuant to which Grand Canyon Education, Inc. agreed to recruit students on behalf of Grand Canyon University, Inc. and perform various related tasks, such as obtaining student permission to apply for federal student loans, handling enrollment paperwork, and illegally incentivizing recruiters to enroll students and claim federal benefits for programs that were worthless to them.

122.

The enterprise was characterized by Defendants' false representations and omissions to prospective students about the accreditation and usefulness of their professional degree and certificate programs, which enabled the enterprise to enroll students, gaining market share for GCU at the expense of accredited programs.

123.

The enterprise was further characterized by Defendants' false representations and omissions to prospective students which induced them to apply for, and become obligated to

repay, federal student loans. It was known by Defendants that all such federal student loan funds would be wasted and that students would receive no benefit for their indebtedness.

124.

The true nature of GCU's unaccredited professional programs was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiffs and the Class members.

125.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. were employed by and associated with an illegal enterprise, and conspired, conducted, and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343, all in violation of RICO, 18 U.S.C. §§ 1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) calling, mailing, emailing, and texting prospective customers inaccurate information about unaccredited GCU programs; (2) using the mails and telecommunications systems to request and receive documents from prospective students, including applications and federal student loan forms; (3) sending and receiving thousands of statements over a number of years regarding federal student loans that were sought under false pretenses and with the most important information (whether programs were accredited) left undisclosed, omitted, and affirmatively misrepresented; and (4) receiving over that same time payments from students and the federal government for programs that had been misrepresented to Plaintiffs and members of the Class. Defendants enrolled students in all

39

50 states and charged them tuition and other fees for worthless academic programs, the payments for which flowed from those various states and the federal government back to Defendants.

126.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. profited from the enterprise, and Plaintiffs and the Class members suffered because the enterprise significantly increased the amounts paid by them and for which they became indebted. Grand Canyon University, Inc. and Grand Canyon Education, Inc. used the proceeds from this scheme to advance the scheme by, among other things, funding and operating their marketing and recruiting machine, including through the use of the mails and interstate wires to contact more students, providing them misrepresentative information, and obtaining tuition payments and fees that offered no benefit, thereby growing the enterprise and causing further injury to the members of the Class. .

127.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. conspired to defraud Plaintiffs and the Class, who enrolled in unaccredited programs that were worthless to them. These programs were provided through standard practices and using uniform notices and documentation. Grand Canyon University, Inc. and Grand Canyon Education, Inc. jointly concocted their scheme to misrepresent the programs at issue and used Grand Canyon Education, Inc. resources in an effort to violate federal law and regulation applicable to all schools that receive federal student loan funds. Grand Canyon University, Inc. and Grand Canyon Education, Inc. aggressively marketed these worthless professional degree and certificate programs to Plaintiffs and the members of the Class. Indeed, having settled prior litigation about illegal

40

recruiting practices, Defendants were well aware that their methods for incentivizing recruiters violated federal law. Rather than cease their efforts, they have doubled down in order to keep increasing the number of students and. more importantly, the amount of their federal student loan funds.

128.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. concealed their fraudulent practices in several ways: first, by using different corporate entities and third-party vendors to recruit students for unaccredited programs; second, by making sure that very few students in the unaccredited programs completed the programs, thereby greatly reducing the likelihood that the program's unaccredited status would become known the student; and third, by training recruiters, who double as student "advisors" at GCU, to misrepresent accreditation status in various ways, including by reference to GCU's general accreditation. In Defendants' repeated communications with Plaintiffs and the Class members – via email, online, phone, and mail – they always failed to provide the critical information about accreditation.

129.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. have tested their methods and practices of misrepresenting unaccredited programs and have developed strategies that they have found to improve the likelihood that prospective students and current students will not realize that their programs are not accredited. For example, many recruiter calls with students are recorded. These calls are studied by supervisors and the most successful methods for misrepresenting unaccredited programs are then shared with all recruiters. Because of the recorded calls, Defendants are well aware of the active misrepresentation that is occurring and

indeed encourage such efforts. Based on the financial success of the scheme for Defendants, it has been deployed more aggressively over the years and is now utilized for all unaccredited programs.

130.

To further obscure the fraudulent scheme, Defendants prominently state in marketing and advertising materials to candidates for professional degree programs that Grand Canyon University is accredited, knowing that such pronouncements mislead prospective students into thinking that their specific program is accredited.

131.

The members of the RICO enterprise all share a common purpose: to enrich themselves at Class members' expense by maximizing the revenues of Defendants by fraudulently obtaining tuition and fee revenue for unaccredited professional degree programs. Grand Canyon University, Inc. and Grand Canyon Education, Inc. both benefitted financially from their joint scheme to defraud Plaintiffs and the Class members, including by sharing the tuition and fees obtained from Class members and other monies which they would not have received but for the existence of the scheme.

132.

This RICO enterprise has existed for at least six years and continues to expand and operate pursuant to agreements entered into between and among Grand Canyon University, Inc., Grand Canyon Education, Inc., and other unnamed co-conspirators. The RICO enterprise has functioned as a continuing unit and has and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

133.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

134.

By fraudulently collecting tuition and fees to which they were not entitled, Defendants used the United States Mail and interstate electronic wires and thus committed hundreds of thousands, if not millions, of separate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343. These acts and transactions were not isolated but were related and part of the same fraudulent scheme; were directed at Plaintiffs and each Class member; were committed in the same or similar manner; and resulted from the same or similar fraudulent and improper intent by Defendants.

135.

As Plaintiffs have alleged, Defendants have systematically misrepresented their unaccredited programs to Plaintiffs and the Class members, and the specific examples recited herein are illustrative and not exhaustive.

136.

Furthermore, Grand Canyon University, Inc. and Grand Canyon Education, Inc. continue to engage in these predicate acts and to harm the Class members on a regular basis, which

establishes a threat of long-term racketeering activity and evidences the continuity of Defendants' open-ended pattern of racketeering activity.

137.

Defendants received payment for the unaccredited programs from Plaintiffs and the Class members (and the federal government on their behalf) through the United States Postal Service and interstate wire facilities. These mailings and wirings are part of the pattern of racketeering activity in which Defendants engaged. In furtherance of the scheme, Defendants committed thousands of separate mail and wire fraud violations on a periodic basis over more than six years by transmitting their federal student loan documentation, each piece constituting its own separate and distinct predicate act, through the United States mail and interstate wire facilities. Each of these violations was related because they effectuated the common purpose of the enterprise and its participants of defrauding Plaintiffs and the Class by collecting tuition and fees for worthless academic programs the deficiencies of which were undisclosed, omitted, and/or misrepresented. Grand Canyon University, Inc. and Grand Canyon Education, Inc. also transferred between and among themselves, and received from Plaintiffs and the Class, monetary proceeds of the enterprise, in furtherance of their scheme to defraud Plaintiffs and Class members in violation of 18 U.S.C. § 1343.

138.

These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

44

139.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiffs and the Class. Defendants' scheme was reasonably calculated to deceive Plaintiffs and Class members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the usefulness of worthless unaccredited professional degree programs. Plaintiffs and Class members would not have enrolled nor paid tuition and fees but for the uniform misrepresentations by Defendants.

140.

Defendants received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce. Furthermore, Defendants used and invested the income they received through a pattern of racketeering activity to operate the enterprise, which caused Plaintiffs and the Class members to suffer damages. As noted above, the investment of the proceeds from the scheme in the enterprise enabled Defendants to perpetuate the operation of the enterprise and to continue to defraud Plaintiffs and Class members, in violation of 18 U.S.C. § 1962(a).

141.

Grand Canyon University, Inc. and Grand Canyon Education, Inc. conducted and participated both directly and indirectly in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

142.

Grand Canyon University, Inc., Grand Canyon Education, Inc., and other unnamed co-conspirators, as noted above, conspired to violate sections 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).    The agreement between Grand Canyon University, Inc. and Grand Canyon Education, Inc. is reflected by, among other things, the many written agreements between them (several of which have been described in public filings); their joint participation in the same fraudulent scheme that would not have been able to proceed without their joint participation and knowledge; and their intentional and knowing sharing of the proceeds from the scheme.

143.

Grand Canyon University, Inc. and Grand Canyon Education, Inc.'s conduct and participation in the racketeering activity described herein have directly and proximately caused Plaintiffs and the Class to incur damages.

## COUNT IV: Violation of Arizona Civil RICO Act
## A.R.S. § 13-2314.04, *et seq.*

144.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-143 above as though fully set forth herein.

145.

Plaintiffs bring this claim individually and on behalf of all other Class members.

146.

Arizona law may be deemed to apply to the claims of all Plaintiffs and Class members. Arizona has adopted a RICO Act substantially similar to the federal RICO Act. *See* A.R.S. § 13-

2314.04, *et seq.* Indeed, Arizona courts have specifically adopted federal precedents to interpret and enforce claims pursuant to Arizona's civil RICO Act.

147.

In the interest of brevity and liberal pleading, therefore, Plaintiffs have incorporated Count III and rely on the allegations and claims therein to assert their Arizona RICO claims.

148.

Grand Canyon University, Inc. and Grand Canyon Education, Inc.'s conduct and participation in the racketeering activity described herein has directly and proximately caused Plaintiffs and the Class to incur damages as contemplated under the Arizona civil RICO Act.

## COUNT V:  Violation of Arizona Consumer Fraud Act
## A.R.S. § 44-1521, *et seq.*

149.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-148 above as though fully set forth herein.

150.

Arizona law may be deemed to apply to the claims of all Plaintiffs and Class members. The Arizona Consumer Fraud Act ("CFA"), A.R.S. § 44-1521, *et seq.*, prohibits:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

151.

The courses and programs advertised, marketed, and sold by GCU qualify as "merchandise" under the CFA. GCU qualifies as a "person" under the CFA.

152.

A statement is "deceptive" if it has the tendency and capacity to convey misleading impressions to consumers, even if interpretations that would not be misleading also are possible. Whether a statement has the tendency to mislead is determined from the perspective of the "least sophisticated reader," in light of all that is reasonably implied, not just from what is said. It is not necessary for the plaintiff to show that the defendant made an affirmative misstatement. Material omissions are also actionable. A misrepresentation causes injury where the consumer relies on it, but this reliance need not be reasonable.

153.

GCU represented to Plaintiffs and the Class that GCU professional degree and certificate programs were accredited in the various relevant states when they were not. This representation is false because the GCU programs at issue are not accredited in the states where Plaintiffs and Class members worked and/or lived.

154.

GCU's misrepresentation and omission is material because no person in their right mind would spend time and money on an unaccredited program that will not be accepted by the relevant employer or licensing agency. The value or worth of the degree or certificate is the most material factor when considering such programs. Indeed, there is no reason whatsoever to waste time and money (or accrue indebtedness) based on professional degree programs which

cannot advance professional goals. Plaintiffs and the members of the Class chose to enroll only because GCU misrepresented the programs at issue.

155.

GCU knows that its misrepresentations are false because it fields complaints from hundreds of students each year. Under the GCU system, the same "advisors" who recruit students also continue to interact with enrolled students. As such, advisors know that degrees are often not accredited in various states. Indeed, GCU trains advisors in how to handle questions and complaints about accreditation issues at each phase of the relationship with the student or prospective student.

156.

GCU intended that Plaintiffs and the Class members rely upon GCU's misrepresentations and omissions leading Plaintiffs and Class members to choose to enroll in a GCU program instead of a program offered by an accredited institution.

157.

Plaintiffs and the members of the Class were consequently and proximately injured by GCU's misrepresentation and omission when Plaintiffs and the Class enrolled in a GCU program instead of a program offered by an accredited institution.

158.

GCU's pattern of misrepresentations and omissions complained of herein show that Defendants are willful, wanton, and show a reckless indifference to the interests of others. Therefore, Plaintiffs and the Class are entitled to an award of punitive damages.

## COUNT VI: Intentional Misrepresentation

159.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-158 above as though fully set forth herein.

160.

GCU represented to Plaintiffs and the Class that the GCU professional programs at issue were accredited in the relevant states, as described in detail above.

161.

This representation was false because the GCU programs were not accredited at the time of enrollment by Plaintiffs or Class members.

162.

GCU's misrepresentation is material because in fields that require professional licensure – such as teaching and healthcare – spending time and money on unaccredited coursework is pointless. There is literally no benefit to be derived from unaccredited courses. As detailed above, accredited programs cannot even accept course credits from transferring students from unaccredited programs.

163.

GCU knows that its misrepresentation is false because it actively trains all student-facing personnel if how to handle questions of accreditation. Specifically, employees are taught how to mislead prospective students to induce them to enroll in worthless studies and they are trained in how handle questions and concerns from enrolled students in the worthless programs.

164.

GCU intended that Plaintiffs and the Class members rely upon GCU's misrepresentation because only if they enroll, or continue, in these programs does GCU receive tuition and fee income.

165.

Plaintiffs and the members of the Class were unaware of the falsity of GCU's misrepresentations until after enrolling and, in many cases, until after completing the programs.

166.

Plaintiffs and the members of the Class relied on the truth of GCU's misrepresentations. Plaintiffs and members of the Class would not have enrolled programs not accredited in the relevant state because to do so was of no possible benefit to them and would detract from their wherewithal in time and money to complete an accredited program.

167.

Plaintiffs and the members of the Class had a right to rely on GCU's representations.

168.

Plaintiffs and the members of the Class were consequently and proximately injured by GCU's misrepresentation when Plaintiffs and the Class enrolled in unaccredited GCU programs instead of accredited programs at other schools, thereby wasting time and money, and accruing indebtedness without receiving any benefit.

## COUNT VIII: Unjust Enrichment

169.

Plaintiffs restate and incorporate by reference the allegations in Paragraphs 1-168 above as though fully set forth herein.

170.

Plaintiffs bring this claim individually and on behalf of all other Class members.

171.

As alleged in this Complaint, Defendants were unjustly enriched at the expense of Plaintiffs and the other Class members, who were enrolled in programs that obviously did not meet their needs and then grossly and inequitably charged tuition which GCU knew would not result in any benefit for the students.

172.

Plaintiffs and the other Class members were unjustly deprived of money obtained by Defendants as a result of their undisclosed, unfair, unscrupulous, and unconscionable recruiting and enrollment practices.

173.

It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other Class members as a result of their wrongful conduct alleged in this Class Action Complaint.

174.

Plaintiffs and the other Class members are entitled to seek and do seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of their wrongful conduct.

175.

Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

176.

Under the doctrine of unjust enrichment, as interpreted under Arizona law, it is inequitable for Defendants to be permitted to retain the benefits they have received, and are still receiving, without justification. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

177.

The financial benefits derived by Defendants rightfully belong to Plaintiffs and members of the Class. As needed, a constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiffs and the members of the Class.

178.

Plaintiffs and members of the Class have no adequate remedy at law.

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, request that this Court:

(a)    Certify this case as a class action and appoint Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(b)      Award Plaintiffs and the Class actual, incidental, and consequential damages in an
amount to be proven at trial, including any and all compensatory damages, treble
damages, punitive damages, restitution, any applicable penalties and interest,
authorized attorneys' fees and costs, and any further relief as the Court deems
just, equitable, and proper;

(c)      For an award of all reasonable costs and attorneys' fees incurred by Plaintiffs;

(d)      For trial by jury of all matters; and

(e)      For such other and further relief as the Court may deem just and equitable.

DATED this 18th day of July, 2019.

Respectfully submitted,

BY:     WEBB, KLASE & LEMOND, LLC

/s/ E. Adam Webb
E. Adam Webb
  Georgia Bar No. 743910
Matthew C. Klase
  Georgia Bar No. 141903
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-9325
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com
Franklin@WebbLLC.com

*Attorneys for Plaintiffs*

54

Fulton County Superior Court
***EFILED***TV
Date: 7/18/2019 3:46 PM
Cathelene Robinson, Clerk

## General Civil and Domestic Relations Case Filing Information Form

☑ Superior or ☐ State Court of __Fulton_____ County

| For Clerk Use Only | |
|---|---|
| Date Filed __7/18/2019__ | Case Number __2019CV324006__ |
| MM-DD-YYYY | |

**Plaintiff(s)**
Austin, Debra

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Baker, Tammy | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**
Grand Canyon University, Inc.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Grand Canyon Education, Inc. | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** E. Adam Webb          **Bar Number** 743910          Self-Represented ☐

### Check One Case Type in One Box

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Family Violence Petition
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Modification
- ☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____          _____
**Case Number**                           **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
**Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____

_____